IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GNC FRANCHISING, INC.                    )
     Plaintiff,                              )    Civil Action No. 05-0270
                                             )    Judge Gary L. Lancaster
           vs.                          )    Magistrate Judge Lisa P. Lenihan
                                             )
TIM O'BRIEN, DOROTHY O'BRIEN, and        )
BISCAYNE NUTRITIONAL SERVICES,           )
INC.,                                    )
     Defendants.                             )

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

I.  **RECOMMENDATION**

It is respectfully recommended that the Motion to Dismiss filed by Plaintiff GNC

Franchising, Inc. ("GNC") as to the counter-claims raised by Defendants be granted in part and

denied in part, as more fully set forth below.  It is also respectfully recommended that the Court

grant Defendants an appropriate opportunity to amend their counter-claims to allege standing as

to class action claims but that, in the absence of such amendment, those claims be dismissed *sua*

*sponte*.

II.  **REPORT**

This case involves a somewhat complicated history of the franchise relationship between

GNC, as franchisor, and Defendants, as franchisee.  At bottom, Defendants allege that GNC

manipulates its franchise system unfairly and/or unlawfully and to the benefit of company-owned stores in direct competition with the franchisees.

Presently before this Court is GNC's November 4, 2005 Motion to Dismiss the majority of Defendant's counter-claims.  For the reasons discussed in Section V, *infra*, it is recommended that those counter-claims be treated as follows:

Count I - Violation of Class Action Settlement - Defendants should be given twenty (20) days from the date of this Report and Recommendation to amend their counter-claims to allege standing; absent such amendment, this Court should dismiss this Count *sua sponte* for lack of standing.

Count II - Fraudulent Inducement and Negligent Misrepresentation - Defendants bring this counter-claim as to both (a) information allegedly withheld from/misrepresented on GNC's Uniform Franchise Offering Circular ("UFOC") documents, upon which Defendants relied in deciding to enter into franchise agreements for one or more of their three franchise locations; and (b) information provided by GNC to induce Defendants to expand one franchise to include a "Smoothie Bar".  GNC seeks dismissal of this Count as to only the latter, and this Court should deny that request without prejudice, declining to determine on this abbreviated record the complex and novel question of whether the Pennsylvania Supreme Court would bar Defendants' fraudulent inducement claim under the "gist of the action" doctrine.

Count III -Breach of the Covenant of Good Faith and Fair Dealing - Here again, because Defendants' breach of contract claim will proceed, this Court need not, and therefore should not, determine on this abbreviated record the complicated and novel question of whether Pennsylvania law would recognize an independent cause of action by a franchisee against a

franchisor for breach of the covenant of good faith and fair dealing.  The interests of judicial economy particularly counsel deference of a determination on this matter because the record of a recent decision of this Court involving the same Plaintiff and similar facts suggests that this precise question may be addressed by the Third Circuit in a pending appeal.  See Bishop v.GNC Franchising, LLC, Civ. Action No. 05-0827, W.D. Pa., Docket Nos. 126-128 Notice of Appeal (USCA Case No. 06-2302).  Accordingly, GNC's Motion to Dismiss this counter-claim should be denied without prejudice.

Count IV - Breach of Fiduciary Duty - Defendants present no relevant authority for their proposition that GNC owed a fiduciary duty to them and, to the contrary, the imposition of this degree of duty appears inappropriate in the commercial franchise context.  Accordingly, this counter-claim should be dismissed.

Count V - Breach of Contract - GNC does not challenge this counter-claim.

Count VI - Common Law Fraud - Defendants bring this counter-claim as to GNC's imposition of contractually-impermissible "remodeling" fees at more than five-year intervals under the guise of contractually-permissible "reset" fees.  GNC's Motion to Dismiss this counter-claim should be granted as Defendants have failed to allege any reliance as to the remodeling/reset fees, and, moreover, the claim is barred by the gist of the action doctrine.

## III.  Statement of Facts and Procedural History

GNC both (a) operates regional mall-based company stores marketing its own and third-party brand health/nutritional products, and (b) franchises neighborhood strip-mall-based stores. It distributes its own product, as well as third-party products, to its franchisees.  Charges of

unlawful practices leveled against GNC include: (a) unfairly competing with franchisees by, *e.g.*, selling monthly "special" products to the public at a cost lower than that charged to the franchisees; (b) imposing unfair product purchase terms/restrictions on franchisees; and even (c) interfering with third-party vendor's direct sales to franchisees.

There has been significant recent litigation between GNC and its franchisees, most notably a class action before this Court (the "Class Action").  The Class Action Stipulation of Settlement dated August 13, 2001 was made part of  the Court's Final Judgement and Order of Dismissal on October 26, 2001.  In general terms, the Class Action settlement required GNC to undertake good faith, reasonable measures to redress identified inequities in its relationships with, and conduct affecting, franchisees.[1]

These particular Defendants operated three GNC franchise stores in Georgia pursuant to franchise agreements with Plaintiff.  The franchise agreement provisions require certain payments to GNC, including those for (a) royalty fees based upon a percentage of gross sales and (b) national advertising, accounting and financial services.  In addition, Defendants purchased product directly from GNC under the terms of a Product Sales Agreement.  As a result of alleged payment defaults, GNC terminated Defendants' franchises in late 2004 and, on March 1, 2005, GNC filed a Complaint against Defendants alleging breach of contract, tortious interference with business relations, and other claims.  The Consent Order entered in this case on April 21, 2005 substantially resolved all but Plaintiff's claim for contractual amounts due.

---

[1]  As discussed, *infra*, it is unclear whether Defendants elected to participate in the Class Action or to opt out.  See Section V(A).

4

Defendants answered on May 12, 2005, and filed an amended Answer and Counterclaim, with this Court's approval, on October 25, 2005.  The counterclaims raised are as follows:

A) That Plaintiff breached the terms of the 2001 Class Action settlement.

B) That Plaintiff obtained both (1) Defendants' franchise(s) and (2) their expansion of one such franchise to include a "Smoothie Bar" by fraudulent inducement and/or negligent misrepresentation.  More specifically, Defendants allege that the Plaintiff made misrepresentations and/or omissions in its UFOC regarding the disposition of litigation with other franchisees (the "Savins").   They also allege that GNC made inaccurate representations to them regarding the profitability of expanding a franchise store to add a Smoothie Bar, thus inducing Defendants to rent additional space and incur additional expense.  See Defendants' Counterclaim at ¶¶ 100-108, Plaintiff's Brief in Support of Motion to Dismiss ("BSMD") at 3-4.

C) That Plaintiff breached an implied covenant of good faith and fair dealing.

D) That Plaintiff breached a fiduciary duty owed to Defendants on account of "the special relationship and special circumstances between [GNC] and Defendants."  See Defendants' Counterclaim at ¶ 117.

E) That Plaintiff breached its franchise agreement(s) with the Defendants.

F) That Plaintiff committed common law fraud by improperly classifying contractually impermissible "remodeling" fees as unreasonable and excessive "reset" fees, in order to circumvent provisions of the franchise agreements restricting an assessment of remodeling fees to once every five (5) years.  See Defendants' Counterclaim at ¶¶ 133-141; Plaintiff's BSMD at 4.

**IV.  Standard of Review; Choice of Law**

   **A.  Standard of Review**

   In considering a Motion to Dismiss pursuant to Rule 12(b), the Court must accept all allegations as true, draw all reasonable inferences therefrom, and construe the facts thus set forth in the light most favorable to the non-moving party.  See, *e.g.*, Gomez v. Toledo, 446 U.S. 635, 636 n. 3 (1980); Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989).  A claim should only be dismissed on Rule 12(b)(6) grounds when the non-moving party cannot demonstrate any set of facts that would entitle it to relief.  See ALA Inc. v. CCAIR, Inc., 29 F.3d 885, 859 (3d Cir. 1994).  Finally, as the Federal Rules of Civil Procedure require only "notice" pleading, the counter-claims in question need only "make out a claim upon which relief can be granted."  Alston v. Parker, 363 F.3d 229, 233 n. 6 (3d Cir. 2004) (quoting Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002) (noting that the "standard relies on liberal discovery rules . . . to define facts and issues and to dispose of unmeritorious claims").

   **B.  Choice of Law**

   As a preliminary matter, this Court notes that the choice of law provisions of the franchise agreements at issue provide that Pennsylvania law shall apply to all disputes arising thereunder.  While Plaintiff anticipates an assertion that some or all of Defendants' counter-claims are properly assessed under Georgia law,[2] Defendants for their part argue the issues under Pennsylvania law.[3]

_____

   [2] See Plaintiff's BSMD at 3.

   [3] See Defendants' Brief in Opposition at 3 (analyzing the issues under Pennsylvania law, "[w]ithout waiving any arguments Defendants may have regarding the applicability of Georgia law").

As this Court's jurisdiction is based on diversity, it should apply the choice of law rules of the forum state, *i.e.*, Pennsylvania.  Pennsylvania law provides, in turn, that the Court should "honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them."  See <u>Kruzits v. Okuma Machine Tool, Inc.</u>, 40 F.3d 52, 55 (3d Cir. 1994).  In addition, Pennsylvania has adopted Restatement (Second) Conflict of Laws § 187, and, in accordance therewith, held that contract provisions should be upheld as long as the transaction bears a "reasonable relationship to the state whose law is governing."  See, *e.g.*, <u>Churchill Corp. v. Third Century, Inc.</u>, 578 A.2d 532, 537 (Pa. Super. 1990).  As GNC is a Pennsylvania corporation, the Commonwealth has a substantial relationship with Plaintiff, and an interest in Plaintiff's franchise dealings.

Accordingly, the Court considers the state claims implicated in Plaintiff's Motion to Dismiss in accordance with the law of the Commonwealth of Pennsylvania.  See <u>Bishop v. GNC Franchising, LLC</u>, 2005 WL 3263890 (W.D. Pa. Dec. 1, 2005) (reaching same conclusion in similar case).

**V.   <u>Analysis</u>**

**A.  Class Action Violations**

It does not appear from the face of the pleadings that Defendants were parties to, or intended third-party beneficiaries of, the Class Action settlement.  See, *e.g.*, Defendants' Counterclaim at Count I, ¶ 75 (asserting only that "[a] Notice of the Class Action and Hearing on Proposed Settlement was sent to all persons who were GNC franchisees through August 14, 2001").  <u>Compare</u> Notice of Class Action and Hearing on Proposed Settlement, § VIII (setting

forth opt-out provisions).  Accordingly, absent amendment to allege standing within twenty (20) days of the date of this Report and Recommendation, the Court should *sua sponte* dismiss this counter-claim for lack of standing, as the settlement was *res inter alios acta*.

To the extent that this counter-claim was not intended to seek enforcement of the Class Action settlement but was an inartful attempt to bring one or more of the claims raised in said class action, Defendants' purpose must be clarified and the requirements of the Federal Rules of Civil Procedure met in any responsive filing.

### B. Fraudulent Inducement/Negligent Misrepresentation

As noted in Section II, *infra*, GNC does not contest this counter-claim as it relates to omissions from and/or misrepresentations in its UFOC filings.  See Plaintiff's Reply Brief at 1. It does, however, challenge the counter-claim as to information provided in connection with Defendants' extension of its franchise agreement to include a Smoothie Bar.  More particularly, GNC alleges that any such counter-claim is barred by the gist of the action doctrine, "which bars Defendants' tort claims in light of the [parties'] contractual relationship."  See Plaintiff's BSMD at 1.  In support thereof, GNC asserts that such claim "relate[s] solely to alleged tortious conduct during the performance of the franchise agreement and do[es] not involve any duties above and beyond those created by the franchise agreement."  See Plaintiff's Reply Brief at 2.

This sentence combines, however, two quite distinct, and necessarily separate, criteria. That is, it is quite possibly irrelevant that GNC's alleged misconduct occurred during the course of a franchise agreement where such misconduct involved a duty beyond those duties created by said agreement.[4]  A duty not to knowingly make false or misleading statements in order to

---

[4]  See Koresko v. Bleiweis, 2004 WL 3048760, *3 (E.D. Pa. Dec. 30, 2004) (observing that the existence of a contractual relationship is not dispositive in determining whether a tort

induce others to change their position in reliance thereon is, of course, the *sine qua non* of the counter-claim made.[5]  Defendants allege that GNC made fraudulent and/or negligent representations as to the profitability of a Smoothie Bar to induce Defendants to enter into additional contractual obligations.

1.  Summary of Case Law Relevant to Prediction of Whether Pennsylvania Would Bar Fraudulent Inducement Claim Under the "Gist of the Action" Doctrine

As GNC has duly noted, a decision in this Court has recently predicted that Pennsylvania would decline to recognize a claim for fraudulent inducement and negligent misrepresentation against this Plaintiff as a valid, independent claim, and would instead bar such claim under the "gist of the action" doctrine.  See Bishop v. GNC Franchising, LLC, 2005 WL 3263890 (W.D. Pa. Dec. 1, 2005).  This holding represents, however, an application (or perhaps an extension) of a prior prediction that the Pennsylvania Supreme Court would bar, under said doctrine, a fraud and negligence claim "*based on the same factual predicate*" as breach of contract claims.  See Williams v. Hilton Group, PLC, 261 F.Supp.2d 324, 330 (W.D. Pa. 2003) (emphasis added) (granting summary judgment on tort claims and noting that (1) the "contract claims are based upon the same conduct upon which [plaintiff] relies in the tort claims, namely . . . failure to honor the exclusivity provision of the Letter of Intent and failure to negotiate in good faith

---

claim may lie; rather, the essential question is the violation of an additional duty distinct from the contractual obligations) (citing Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 105 (3d Cir. 2001)).

[5]  See discussion of distinction between duties created by social policy and those created solely by contract, *infra*, pp. 11 & n.7, 14 n. 11.  See also, *e.g.*, Bortz v. Noon, 729 A.2d 555, 560 (1999) (setting forth requirements for claim of fraudulent inducement as: (1) a representation; (2) material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to its truth or falsity; (4) with intent to mislead into reliance; (5) justifiable reliance; and (6) proximately-caused injury).

during the period of exclusivity" and (2) "[s]uch conduct occurred mostly during the performance of the agreement"); see also Williams v. Hilton Group, PLC, 2004 WL 516165, *2 (3d Cir. Mar. 17, 2004) (affirming, in non-precedential majority opinion on interlocutory appeal, prediction "on the particular facts presented" in that case).[6]  This Court should respectfully note the critical distinctions between these cases and the case at hand, and decline to extend Bishop's predicted gist of the action bar to this fraudulent inducement/negligent misrepresentation count at this time.

More particularly, the dismissal of this independent cause of action in Bishop turned on a prior prediction - as affirmed by the Williams majority - that, under the gist of the action doctrine, and in particular circumstances, the Pennsylvania Supreme Court would hold that a claim of fraud is properly subsumed into contractual rights.   In Williams, the Third Circuit majority held that the purchasers of an "exclusive" right to buy gaming assets during a due diligence period were barred from a fraud and negligent misrepresentation claim where that claim turned on the seller's negotiator's secret marketing to other buyers.  In so holding, the

---

[6]  But see id. at *3-*5 (Becker, J., dissenting) (disagreeing with majority's abbreviated rendering of the underlying facts, describing claim as one of fraudulent inducement, and disagreeing with majority's "crabbed . . . interpretation and application of the Pennsylvania 'gist of the action' jurisprudence" ).  In his dissent, Judge Becker proceeded to discuss Pennsylvania case law and to distinguish those breach of contract cases in which the party had no present intention to perform the contract terms from those in which the party intended - but later failed - to perform.

The law in this area is, at best, in some disarray.  Compare, e.g., Reilly Foam Corp. v Rubbermaid Corp., 206 F.Supp.2d 643 (E.D. Pa. 2002) (barring fraudulent inducement claim as to exclusive agreement for purchase of sponge mop assemblies, which defendant allegedly did not intend to honor) with Sullivan v. Chartwell Investment Partners, LP, 873 A.2d 710 (Pa. Super. 2005) (holding that claims alleging employer fraudulently/negligently agreed to perform obligations it never intended to perform to induce acceptance of changes to compensation package were collateral to contract performance and therefore not barred by gist of the action doctrine).

Third Circuit  noted that *all of the alleged misrepresentations concerned contract performance matters governed by the agreement*, *e.g.*, exclusivity. See Williams, 2004 WL 516165, *2.  It also noted that "clarification of the doctrine for precedential purposes must come from the state courts."  Id.

The Williams Court's affirmance of the lower court's prediction that Pennsylvania would bar, under the gist of the action doctrine, a tort claim premised entirely on contract term performance was generally in keeping with prior case law.   Indeed, the Pennsylvania Superior Court case primarily cited by the Circuit Court held that the doctrine could apply to bar *"claims for fraud in the performance of a contract"*.   See eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. 2002) (emphasis added) (explaining that , as a practical matter, the doctrine precludes re-casting ordinary breach of contract claims as tort claims).  As the Superior Court  reiterated at that time, the gist of the action doctrine is "designed to maintain the conceptual distinction between breach of contract claims and tort claims", and the latter "lie for breaches of duties imposed by law as a matter of social policy" while the former lie only for "breaches of duties imposed by mutual consensus agreements between particular individuals".[7] Accordingly, a claim should be limited to contract when "the parties' obligations are defined by

---

[7] In so holding, the Superior Court was restating its previous *en banc* interpretation of the doctrine.  See Redevelopment Auth. of Cambria Cty. v. International Ins. Co., 685 A.2d 581, 590 (Pa. Super. 1996) (en banc) (quoting Phico Ins. Co. v. Presbyterian Med. Servs. Corp., 663 A.2d 753, 757 (Pa. Super. 1995) (same)).

See also, *e.g.*, Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103-04 (3d Cir. 2001) (same); Nutrisystem, Inc. v. National Fire Ins. of Hartford, 2004 WL 2646598, *5 (E.D. Pa. Nov. 19, 2004) (extensively discussing cases in support of conclusion that "[t]he Pennsylvania Superior Court appears to limit the gist of the action doctrine to claims based on allegations that a party committed a tort *in the performance of duties under* a contract" and that it "distinguish[es] between torts that arise from the breach of duties imposed as a matter of social policy and torts that arise from the breach of duties imposed by the contract") (emphasis added).

the terms of the contracts, and not by the larger social policies embodied in the law of torts."

Bash v. Bell Tel. Co., 601 A.2d 825, 830 (1992).[8]   The eToll Court went on to conduct an

extensive review of federal cases within the Third Circuit applying the gist of the action doctrine

to fraud claims.  See 810 A.2d at 17-19.  It concluded that

> the cases seem to turn on the question of whether the fraud concerned the
> performance of contractual duties.  If so, then the alleged fraud is generally held
> to be merely collateral to a contract claim for breach of those duties.  If not, then
> the gist of the action would be the fraud, rather than any contractual relationship
> between the parties.

810 A.2d at 19.[9]   Compare also, e.g., Nutrisystem, Inc., 2004 WL 2646598 at *6 (declining to

interpret doctrine broadly where claims alleged "violation of various state laws" regarding fraud

and so arose "from duties imposed as a matter of social policy, not from duties imposed by the

franchise agreements"); Flynn v. Health Advocate, Inc., 2004 WL 51929, *10 (E.D. Pa. Jan. 13,

2004) (declining to dismiss fraudulent inducement claim under gist of the action doctrine, as

courts have distinguished between fraud in the inducement and fraud in the performance claims,

and doctrine has "less applicability" to the former);  Foster v. Northwestern Mutual Life, 2002

---

[8]   Bash was the first Pennsylvania Superior Court case to recognize the gist of the action doctrine.  The first Pennsylvania state appellate case to address the interplay between this doctrine and fraud was eToll.  See 811 A.2d at 15-16.

[9]   The eToll court also summarized the "persuasive authority interpreting Pennsylvania law" on the gist of the action doctrine as barring tort claims: (1) "arising solely from a contract between the parties", (2) where "the duties allegedly breach were created and grounded in the contract itself", (3) where "the liability stems from a contract", or (4) where the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."   810 A.2d at 19.

The Pennsylvania Superior Court's holding in eToll, as the ruling of the intermediate appellate court, "must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise."  U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996).

WL 31991114, *2-3 (E.D. Pa. July 25, 2002) (denying motion to dismiss and suggesting that fraud in the inducement of a contract would generally be collateral to, rather than interwoven with, the contract itself) with Phico Ins. Co. v. Presbyterian Med. Servs. Corp., 663 A.2d 753 (Pa. Super. 1995) (holding that allegations regarding performance of management consulting agreement were contractually-based claims); Penn City Investments, Inc. v. Soltech, Inc., 2003 WL 22844210, *3 (E.D. Pa. Nov. 25, 2003) (holding that gist of the action doctrine barred fraudulent inducement claim because "pre-contractual statements *concerned specific duties* that the parties later outlined in the contract") (emphasis added).[10]

In Bishop, the District Court, relying on Williams and eToll, dismissed claims that GNC "committed fraud and negligent misrepresentation that induced plaintiffs to enter into the franchise agreements" by "failing to disclose . . . alleged predatory pricing and marketing schemes in its [UFOC]."  2005 WL 3263890.  More specifically, the plaintiffs averred that GNC misrepresented (1) the amount of franchisee training offered; (2) the freedom of franchisees to purchase from third-party suppliers; (3) the amount of revenue and profit derived by GNC from its franchisees; and (4) the unequal treatment of franchise and company-owned stores.  The District Court noted that all but the first of these claims were included in the plaintiffs' breach of contract claim and concluded that "[t]hese issues, therefore 'sound in contract', and the allegations of fraud and negligence are inextricably intertwined with plaintiff's breach of contract claim."  Id.  To the extent that the Bishop fraudulent inducement claims were based on

---

[10]  See Williams, 2004 WL 516165, *2 (finding Penn City "instructive").  See also Nutrisystem, Inc., 2004 WL 2646598 at *5 (canvassing several Pennsylvania Superior Court and District Court cases applying gist of action bar where tort arises from performance of duties imposed by contract but "refus[ing] to apply the doctrine" where cause of action is based on violation of social policy).

representations encompassed by the contract's performance terms, that case may be factually distinguishable from the case at hand.  In either event, this Court should at this time decline to either (a) extend a gist of the action bar to the matter *sub judice*, or (b) predict that *all* claims of fraudulent inducement, regardless of their relationship to the parties' contract performance terms, are barred by the gist of the action doctrine.

As discussed, *supra*, the relevant cases do not clearly support a conclusion that a franchisee's claim of fraudulent inducement premised on misrepresentations of prior and/or future profitability is, at its center, a contract claim.  At *most*, perhaps, it may be argued that to restrict a franchisee's cause of action to rights and duties defined by a contract alleged to have been fraudulently attained would appear to meet neither the analytical nor the equitable guidelines of the law.  At *least* it should be acknowledged that a close reading of the language and distinctions of Pennsylvania - and interpretive federal - jurisprudence leaves open the question of whether the gist of the action doctrine would bar fraud/negligent misrepresentations both (a) made in the inducement and (b) regarding matters apart from the parties' contract performance.[11]

---

[11]   See *supra;* Sullivan, 873 A.2d at 718-19 (vacating grant of demurrer on gist of the action bar, and discussing eToll's "thorough analysis" of the application of the doctrine to a fraud claim and conclusion that "if the fraud did not concern the performance of contractual duties, then the gist of the action would be the fraud, rather than any contractual relationship between the parties"); id. (concluding that "tort claims relate[d] to the inducement to contract", as opposed to "failure to perform [contract] obligations", claims were "collateral to the performance of the contracts and . . . not barred by the gist of the action doctrine").   Sullivan is the Pennsylvania Superior Court's most recent writing on this question.

See also Nutrisystems, Inc., 2004 WL 2646598, at *6 (concluding that claims based on violations of "exclusive marketing" franchise contract provisions were barred, but that other claims - including violations of state laws regarding fraud - were *not* barred under Pennsylvania Superior Court's application of gist of the action doctrine); Air Products and Chemicals, Inc. v. Eaton Metal Products, Co., 256 F.Supp.2d 329, 341 (E.D. Pa. 2003) (recognizing that "[f]raud in

2.  Prediction of Pennsylvania Law; Recommendation that Court Defer Determination of this Issue at this Time

As a District Court exercising diversity jurisdiction, this Court must, of course, apply the substantive law of the state whose law governs the action, *i.e.*, the Commonwealth of Pennsylvania.  See Jaasma v. Shell Oil Co., 412 F.3d 501, 507 n. 5 (3d Cir. 2005).  Accordingly, were this Court to assess the scope of a gist of the action bar at this time, a complete analysis under Erie would require - absent an express ruling from the Pennsylvania Supreme Court dispositive of the question - consideration of the decisions of the intermediate appellate courts,[12] as well as the policies at issue, analogous decisions, and both the core and inter-related legal

---

the inducement of a contract would not necessarily be covered by [the gist of the action] doctrine because fraud to induce a person to enter a contract is generally collateral to (*i.e.*, not 'interwoven' with) the terms of the contract itself") (quoting eToll and discussing Foster); Flynn, 2004 WL 51929 at * 10 (noting that "the distinction between fraud in the inducement and fraud in the performance claims with regard to the gist of the action doctrine is crucial . . . because [the former] are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists").  Cf.  Bohler-Uddeholm, 247 F.3d at 104-05 (holding breach of fiduciary duty claim not barred by gist of the action doctrine where duties owned minority partner were separate and distinct from contractual duties of joint venture agreement); Hershey Entertainment & Resorts Co. v. Interactive Rides, Inc., 2005 WL 3320843, *5 (M.D. Pa. Dec. 7, 2005) ("Under the 'gist of the action' doctrine, a tort claim *based on the failure to fulfill contractual duties* can only be maintained if the contract is 'collateral' to conduct that is primarily tortious.") (emphasis added).

Finally, it should perhaps be noted that in *its* most recent writing on this question, the Third Circuit selected citations to eToll and Sullivan discussed *supra* and concluded that because the tortious interference claim at issue turned on a violation of a duty not to compete, the source of which "could only be contractual", said claim was barred under the gist of the action doctrine.  Chemtech Intern, Inc. v. Chemical Injection, 2006 WL 690837, *4 (3d Cir. Mar. 20, 2006) (Slip Op.).

[12]  See *supra*, n. 9 (discussing requisite weight to be given Pennsylvania Superior Court decisions).

doctrines.[13]  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) (requiring that "[w]hen the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue"); Gruber v. Owens-Illinois, Inc., 899 F.2d 1366, 1369-70 (3d Cir. 1990) (holding that to predict Pennsylvania Supreme Court's response to issue not previously before it, federal court should examine: Supreme Court's statements in related areas; "decisional law" of the intermediate courts; federal appeals and district court cases interpreting state law; and decisions from other jurisdictions discussing the issue); id. at 1375 (concluding review of "sources of authority and persuasive data").[14]

---

[13]  For example, although the Pennsylvania Supreme Court has not yet expressly spoken to the "gist of the action" doctrine, it has repeatedly recognized fraudulent inducement as a valid claim.  See, e.g., Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451 (Pa. 1971).  These holdings should be considered in an evaluation of whether that  same Court would apply the gist of the action doctrine so broadly as to swallow up this otherwise cognizable claim.  See Gruber, 899 F.2d at 1369-70 (noting the importance of the opinion of the Pennsylvania Supreme Court on matters "closely relevant" to the one under consideration).

[14]  See also Dilworth v. Metropolitan Ins. Co., 418 F.3d 345, 349 (3d Cir. 2005) (same); Official Committee of Unsecured Creditors v. Lafferty, 267 F.3d 340, 349 (3d Cir. 2001) (citing Gruber and considering "policy underlying Pennsylvania tort law" in making prediction); Neurotron, Inc. v. Medical Services Ass'n of Pa., Inc., 254 F.3d 444, 449 (3d Cir. 2001) (considering Superior Court's related decision and noting that, even without "the benefit of" that decision, federal court would reach same prediction based on Pennsylvania Supreme Court's demonstrated adherence to more general principles discussed).

Thus, given the nature of the issues raised by this counter-claim, the Court should decline to make a decision on this question in this procedural posture.[15]  Instead, the Court should follow the more prudent course of withholding judgment on the unsettled question of law until the issues are more clearly focused and the facts definitively found.  See, e.g., Petition of Bloomfield S.S. Co., 298 F.Supp. 1239, 1242 (D.C.N.Y. 1969).  This Court should also "press the case forward to determine whether a . . . disposition on the merits may be reached on less debatable legal grounds, or on findings that under settled law would be decisive of the outcome regardless of how the legal issue of first impression might later be resolved in higher courts." Cohesive Technologies v. Waters Corp., 130 F.Supp.2d 157, 160 (D.C. Mass. 2001); id. (observing that trial judge has no obligation "to decide forthwith the legal issue of first impression advanced by the movant").  Cf. id. (explaining that denial of motion is appropriate where movant "fails to show that no responsive legal theory will be available to the opposing party, along with facts to support that theory, to defeat the asserted entitlement to summary judgment").[16]

---

[15]  Cf. Wright & Miller, 10A Fed. Prac. & Proc. Civ. 3d § 2725, text at n. 13 (observing that the difficulty of the legal issues involved is relevant to a grant/denial of summary judgment and that complex questions of law frequently require a more concrete factual development); Williams, 2004 WL 516165, *2 (stating that application of the "gist of the action" doctrine calls "for a fact-intensive judgment as to the true nature of a claim").   It is certainly far from clear that  factual development in this case would shed no light on the question for either this Court or the Court of Appeals.

[16]  Cf. also Sullivan v. Chartwell Investment Partners, LP, 873 A.2d 710, 714 (Pa. Super. 2005) (observing, in vacating and remanding, that question presented by demurrer was "whether, on the facts averred, the law says with certainty that no recovery is possible" and that any doubts should be resolved in favor of the non-movant); Sturm v. Clark, 835 F.2d 1002, 1011 (3d Cir. 1987) (noting that a motion to dismiss "tests the legal sufficiency" of the complaint); Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust Co., 560 A.2d 151, 152 (Pa. Super. 1989).

In sum, the Court should in this matter concur with the conclusion of its sister Court in Foster.  See 2002 WL 31991114, *3 (denying 12(b)(6) motion under gist of action doctrine, and noting the importance of discovery to non-movant's ability to show "that he was fraudulently induced" in a manner that "would implicate the 'larger social policies' of a tort action (*e.g.* society's desire to avoid fraudulent inducement . . .), and would justify extending [the] case beyond the contractual allegations").[17]   And accordingly, the Motion to Dismiss this Count should be denied without prejudice.[18]

### C.  Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff moves to dismiss this Count as "duplicative of Defendants' breach of contract claim", challenging this Count, as the former, under a predicted jurisprudential position not heretofore expressly addressed by the Pennsylvania Supreme Court.  See Plaintiff's BSMD at 1. More particularly, Plaintiff asserts that although Pennsylvania recognizes this independent cause of action in cases of franchise termination, it would not recognize a cause of action for breach of an implied covenant of good faith and fair dealing as to *non-termination-based* franchisee claims.

The Restatement (Second) of Contracts, § 205, expressly provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and in its

---

[17]  Cf. Chemtech Intern, *supra* n. 11 (affirming District Court's dismissal of tortious interference claim, source of which "could only be contractual").

[18]  Because this Court should not hold that the counter-claim is barred the gist of the action doctrine, the question becomes whether, read in the light most favorable to the Defendants, the counter-claim makes allegations sufficient to survive a motion to dismiss under the liberal federal pleading standard of Fed. R. Civ. P. 8.  It does.  In particular, Defendants have sufficiently alleged that GNC knew or should have known its representations as to the Smoothie Bar's profitability were inaccurate and/or misleading.

enforcement."   And the Pennsylvania Courts have repeatedly embraced this fundamental

principle of the Restatement.  See, e.g., Frickert v. Deiter Bros. Fuel Co., 347 A.2d 701, 705

(Pomeroy, J. concurring); Atlantic Richfield Co. v. Razumic, 390 A.2d 736, 740-41 (Pa. 1978);

Bethlehem Steel Corp. v. Litton Indus. Inc., 488 A.2d 481, 600 (Pa. 1985) (Zappala, J., Opinion

in Support of Reversal) ("We have previously accepted as the law of this Commonwealth the

principle stated in [§ 205] . . . .") (citing Razumick; Germantown Mfg. Co. v. Rawlinson, 491

A.2d 138, 148 (Pa. Super. 1985); Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. 1992)

(citing Frickert); Stamerro v. Stamerro, 899 A.2d 1251 (Pa. Super. 2005) ("Additionally, this

'Commonwealth has accepted the principle in [§ 205] that 'every contract imposes upon each

party a duty of good faith and fair dealing . . . .'"") (quoting John B. Comonos, Inc. v. Sun Co.,

Inc., 831 A.2d 696, 705-6 (Pa. Super. 2003)).[19]

On the other hand, some Pennsylvania decisions have indicated that a duty of good faith

and fair dealing is applicable only in limited contexts.  See, e.g., Baker v. Lafayette College, 504

A.2d 247, 255 (Pa. Super. 1986) (concluding that, under circumstances of case, employer had

duty of good faith, but expressly limiting holding as not "present[ing] the more difficult issue

whether an obligation of good faith and fair dealing should be implied into any employer-

employee relationship"); Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust

Co., 560 A.2d 151, 153 (Pa. Super. 1989) (citing § 205, but concluding that "[i]n this

---

[19]  Cf. Donahue v. Federal Express Corp., 753 A.2d 238, 241 (Pa. Super. 2000) ("Every
contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its
performance and enforcement."); Liazis v. Kostas, Inc., 618 A.2d 450, 453 (Pa. Super. 1992)
(same); Romeo v. Pittsburgh Assocs., 787 A.2d 1027 (Pa. Super. 2001) (same).

Commonwealth the duty of good faith has been recognized in limited situations").[20]  Indeed, one

---

[20]  See also Valencia v. Aloette Cosmetics, Inc., 1995 WL 105498, *1 (E.D. Pa. Mar. 10, 1995) ("The Pennsylvania Supreme Court has not explicitly addressed the issue of whether every contract implies a duty of good faith.  However, the Court of Appeals has held that 'under Pennsylvania law, every contract does not imply [such] a duty . . . .'") (quoting Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 701 (3d Cir. 1993)); id. at *1 n. 4 (citing cases suggesting that Pennsylvania has adopted § 205 and observing that some decisions of the Eastern District "issued after Parkway have relied on [Somers] . . . for the proposition that Pennsylvania has adopted § 205") (citations omitted).

The Third Circuit's position on Pennsylvania's application of an implied covenant of good faith appears subject to disparate construction.  Compare, e.g., Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport Auth., 1996 WL 442784 (E.D. Pa. Aug. 1, 1996), *18 n.11 ("recogniz[ing that] there is some basis for [the] position" that "a good faith duty exists for all contracts in Pennsylvania" but following "the Third Circuit's interpretation" that such duty applies only in limited situations) with Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 525-26 (3d Cir. 1996) (implying duty of good faith in release-dismissal agreement, as necessarily "follow[ing] from the duty of good faith and fair dealing, Restatement (Second) of Contracts § 205"); id. at 526 n. 11 (noting that "[t]he duty of good faith and fair dealing exists not only under federal common law, but also under Pennsylvania law" and that "'[i]n the absence of an express provision, the law  will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract'") (quoting Somers, 613 A.2d 1214).

Some explanation for the apparent discrepancies is offered in the Circuit's decision in Northview Motors, Inc. v. Chrysler Motors Corporation.  227 F.3d 78, 91 (3d Cir. 2000) (observing that "[t]he UCC . . . is not the sole source of the obligation to perform in good faith because the Pennsylvania courts have cited [§ 205] for the proposition that every contract has an implied term that the parties will perform their duties in good faith"); id. (further observing that "[i]n practice, however, the courts have recognized an independent cause of action for breach of a duty of good faith and fair dealing only in very limited circumstances") (citing Creeger and Parkway Garage).  See also Hershey Entertainment, 2005 WL 3320843, *8 (quoting Northview's holding that the "general duty of good faith is used as an 'interpretive toll to determine the parties' justifiable expectations'" but does not often give rise to an independent cause of action); id. (concluding that party did not have independent cause of action for breach of duty of good faith, but interpreting claims as alleging breach by interference with performance of contractual obligations) (citing Somers as recognizing independent cause of action for bad faith as "interference with or failure to cooperate in the other party's performance").  Cf. Seth William Goren, Looking for Law in All the Wrong Places: Problems in Applying the Implied Covenant of Good Faith Performance, 37 Univ. San Fran. L. Rev. 257, 259-60 (2003) (observing that "two problems . . . have arisen nationally in confronting the covenant: whether the covenant is

commentator has asserted that this area of Pennsylvania jurisprudence, like that of many other states, is in "turmoil", and that a series of "misunderstandings and missteps" has led to an imprecise and "internally inconsistent" body of case law.  See Seth William Goren, Looking for Law in All the Wrong Places: Problems in Applying the Implied Covenant of Good Faith Performance, 37 Univ. San Fran. L. Rev. 257 (2003).[21]

The Pennsylvania Supreme Court has spoken once to the application of an implied covenant of good faith in the franchise context.  See Razumick, 390 A.2d at 740-41 (concluding that "dealer lease" for gas station and course of conduct constituted franchise arrangement) .  In Razumick, the Supreme Court again cited with approval to § 205 (then § 231), and held that an implied covenant of good faith constrains the decision of a franchisor in terminating a franchise agreement.  See id.  at 742 ( holding that absent written provision to contrary, franchisor cannot terminate without cause).[22]

In reaching its decision, the Supreme Court noted the importance of protecting a

implicated in every contractual relationship . . ., and whether a breach of the covenant of good faith gives rise to an independent cause of action or is merely a tool of contractual interpretation"); id. at 285- (providing a cogent analysis of "conflicting" Pennsylvania and interpretive federal decisions in this area).

[21] See also  id. at 281 (discussing at length Pennsylvania's "body of contradictory case law that effectively leaves the matter [of what contractual relationships give rise to an implied covenant of good faith] unresolved"); id. (citing at length conflicting Pennsylvania cases which adopt the Restatement (Second) of Contract's implication of a covenant of good faith to every contract and cases implying said covenant in only limited circumstances); Bicycle Corp. of America v. Meridian Bank, 1995 WL 695090, *3 (E.D. Pa. Nov. 21, 1995) ("The covenant of good faith and fair dealing is a hazy, unsettled legal doctrine, particularly as applied by Pennsylvania courts.").

[22] See also id. at 742 n. 8 (stating that the holding did "not sweep so far" as holdings of other jurisdictions, refusing to enforce express written provisions authorizing petroleum suppliers to terminate franchise agreements without cause and pointedly noting that the instant documents contained "no such express provisions").

franchisee's "reasonable expectations" with regard to investments benefitting the franchisor as well, and explained that restriction of a franchisor's ability to arbitrarily sever its franchise relationship was consistent with both (a) those expectations and (b) a franchisor's "obligation *to deal with* its franchisees in good faith and in a commercially reasonable manner." See id. at 742 & n. 7a (citing Restatement (Second) of Contracts § 231 as "imposing standard of good faith on contracting parties" and U.C.C. § 1-102(3) as "imposing same standard in commercial transactions involving sale of goods") (emphasis added).[23]  The Supreme Court also emphasized the "complex" business relationship between parties to a franchise agreement and the consequently different expectations arising therefrom.  See id. at 744 n. 12 (distinguishing Weilersbacher v. Pittsburgh Brewing Co., 218 A.2d 806 (Pa. 1966) (permitting at will termination of oral agreement between beer supplier and distributor)).[24]

---

[23]  See also Creegar, 560 A.2d at 153 (holding that a lending institution had not breached an implied duty of good faith by negotiating favorable terms, and distinguishing Razumick's imposition of "a duty of good faith . . . upon franchisors in their dealings with franchisees"); Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 618 (3d Cir. 1995) (quoting Creeger and recognizing that "an independent contractual duty to act in good faith 'has been imposed upon franchisors in their dealings with franchisees'").

[24]  A few years later, the Supreme Court held that gasoline service station dealers could not state a claim under "the Razumick standards."  Witmer v. Exxon Corp., 434 A.2d 1222 (Pa. 1981).  In Witmer, the Court made a two-fold distinction from Razumick:

First, it observed that the facts alleged encompassed neither a direct termination nor pretext to force termination of the leases.  In this context, the Court made the largely tautological observation that the "Razumick standards" - defined by the Witmer Court as requiring contract termination "consistent with principles of good faith and commercial reasonableness" - were "applicable only in the context of an attempt on the part of the franchisor to terminate its relationship."  434 A.2d at 1227.  That is, the Court limited its prior articulation of *termination* standards to a *termination* case.  Second, the Court concluded that even if the facts alleged a termination, no bad faith claim was sustainable under Razumick because the franchisor had acted within the express provisions of the written agreement.  In this context, the Court noted that "[t]he Razumick standard serves the valuable purpose of defining contractual relationships which have been left unexpressed by the parties."  Id.

Relying upon Razumick and Creeger, and following a thoughtful discussion of their

analysis, our sister Court has predicted that in light of those decisions "and given the breadth of

the Restatement language, on which the Pennsylvania doctrine is based - it seems unlikely that

the Pennsylvania appellate courts will limit the franchisor's duty to deal in good faith to

situations of franchise termination when the issue is squarely presented." AAMCO

Transmissions, Inc. v. Harris, 759 F. Supp. 1141, 1148-49 (E.D. Pa. 1991). See also Bedrock

Stone & Stuff, Inc. v. Mfrs. & Traders Trust Co., 2005 U.S. Dist. LEXIS 10218 (E.D. Pa. May

24, 2005) (noting that "the Supreme Court of Pennsylvania has specifically adopted a

---

Although Witmer is arguably ambiguous, to the extent subsequent decisions have
understood Witmer to limit applicability of a franchisor's duty of *good faith* to the termination of
a franchise agreement, this Court should respectfully disagree.  To the contrary, no language in
Witmer suggests any disagreement with the Court's prior citation to § 205 of the Restatement
and its concomitant recognition of a duty of good faith in every contractual undertaking.  Nor
does Witmer suggest disagreement with Razumick's holding that a franchisor has a broad duty *to
deal with* its franchisees in good faith.  Rather, it merely distinguishes the circumstances before
it and declines to apply Razumick's "*articulat[ion]*" of the standards for franchisor conduct to a
non-termination, express-written-provision case.  Id.

To say that the "standard of good faith and commercial reasonableness . . . protecting a
franchisee's 'reasonable expectations'" is not applicable to a non-termination case with express
contractual provisions is *not* to reject an implied duty of good faith in non-termination franchise
dealings.  Indeed, the existence of a duty of good faith was *not in question* in Witmer as, under
both the express terms of the written agreement and under statutory provisions applicable
pursuant to the Gasoline Act, the franchisor clearly *had* such a duty.  And the Court concluded
the franchisor evidenced no bad faith in following the terms of the written agreement, noting that
the franchisee had no reasonable expectation to the contrary.  Id.

See also Loos & Dilworth v.Quaker State Oil Refining Corp., 500 A.2d 1155, 1160 (Pa.
Super. 1985) (explaining Razumick as placing two obligations on a franchisor, *i.e.*, to act in good
faith and with commercial reasonableness, when terminating a franchise agreement). Cf. Somers,
613 A.2d at 1213 (observing that the "obligation to act in good faith in the performance of
contractual duties varies somewhat with the context" and providing examples of types of bad
faith); Goren, Looking for Law, 37 Univ. San. F. L. Rev. at 285 (explaining that, consistent with
decades of prior Pennsylvania law, the question "was not whether the covenant [of good faith]
existed [in every contract], but what specific obligations [it] imposed in a given situation").

Restatement rule that the duty of good faith and fair dealing is inherent in every contract" and

predicting that "if given the opportunity" the Supreme Court would expressly hold the same).[25]

 Finally, two cases previously before this Court, involving similar claims and one of these

same parties, have taken somewhat different tacks.  In <u>Kuligowska v. GNC Franchising, Inc.</u>,

2002 WL 32131024 (W.D. Pa. Nov. 25, 2002), a decision not cited in the briefs in the case *sub*

*judice*, the Court reviewed Pennsylvania and interpretive federal case law, and denied GNC's

motion to dismiss a claim for breach of an implied covenant of good faith and fair dealing.

<u>Kuligowska</u> concluded, in light of <u>Witmer</u>, that the franchisees stated a cognizable claim only

---

[25]  Our sister Court in the Eastern District also discussed the doctrine of an implied covenant of good faith and fair dealing at some length in <u>Bicycle Corp. Of America v. Meridian Bank</u>. 1995 WL 695090, *4 (E.D. Pa. Nov. 21, 1995) (discussing the policy purposes of the doctrine and concluding that it is intended to "simplif[y] arrangements between contracting parties by prohibiting one party from acting solely for his own benefit and to the detriment of the entire agreement ").  The Court went on to observe that the doctrine is (a) "most applicable to relationships in which the rights and obligations of the parties are very complicated" and the covenant thus provides the greatest potential savings in contracting time and expense; and (b) intended to "prohibit opportunistic behavior" not specifically addressed in the contract.  <u>Id.</u> at *5 (discussing applicability of doctrine to "on-going contracts which create complex webs of rights and obligations" and in which "parties are likely to be tempted to take advantage of unforseen events through opportunistic behavior"); <u>id.</u> (noting that "Pennsylvania courts have found violations of the duty of good faith and fair dealing in contracts between franchisors and franchisees").  <u>But</u> <u>see</u> <u>Valencia v. Aloette Cosmetics, Inc.</u>, 1995 WL 105498, *2 n. 9 (E.D. Pa. Mar. 10, 1995) (observing that cases in Eastern District reached differing predictions of whether Pennsylvania Supreme Court would expand implied duty of good faith arising from franchise agreement beyond termination context).

 <u>Cf.</u> Robert W. Emerson, <u>Franchise Contract Clauses and the Franchisor's Duty of Care Toward its Franchisees</u>, 72 N. Car. L. Rev. 905, 931-32 & n. 113 (1994) (citing <u>Harris</u> and asserting that "[t]he same policy reasons for having a 'good cause' termination standard applies to a franchisor's use of certain other franchise agreement provisions [in which] the franchisee is arguably at the mercy of the franchisor, and the franchisee's bargaining position is weakened severely by its sunk costs at risk"); <u>id.</u> (observing that "[t]he franchisee rightfully expects the franchisor not to abuse its discretion").  <u>Cf.</u>, <u>e.g.</u>, <u>Photovest Corp. v. Fotomat Corp.</u>, 606 F.2d 704 (7th Cir. 1979) (holding that franchisor breached covenant of good faith by, among other things, locating numerous company-owned outlets in franchisee's area).

because they alleged an "indirect termination", *i.e.*, that GNC "sought to drive" them out of business. Id. at *6.[26]

In comparison, Bishop, the second closely-related decision of this Court, concluded that it is "unclear" whether Pennsylvania would recognize a claim that GNC's conduct in contract performance, as opposed to termination, breached an implied covenant of good faith, and "declined to extend the scope of duty" absent "clear guidance from the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit."  Bishop, 2005 WL 3263890 (granting summary judgment on this claim, citing Razumick, Witmer, Creeger and Harris, and observing that while some courts have "considered the *possibility* of expanding the good faith duty beyond the termination exception of [Razumick], . . . none has yet done so").  See also Plaintiff's Reply Brief at 3 (stating, in reference to Bishop, that "this Court refused to find the existence of a general implied duty of good faith").[27]

As discussed in Section V (B) above, in view of the fact that Defendants' breach of contract claim will proceed, this Court need not, and should not, now resolve this novel question of law  - *i.e.*, whether Pennsylvania law would impose, apart from terminations, an implied duty of good faith and fair dealing on a franchisor's performance of a franchise agreement.  Rather,

---

[26]  See discussion, *supra* n. 24.  See also Valencia, 1995 WL 105498, *2 (concluding that, in light of Witmer, claim for breach of implied duty of good faith could not be sustained absent franchisor's termination or bad faith pretext, "despite the 'increased vigor' with which the Pennsylvania Superior Court [had] embraced § 205 of the Restatement").

[27]  Cf. Northview Motors, 277 F.3d at 92 n. 7 (cautioning that a federal court exercising supplemental jurisdiction over state law claims should be "reluctant to expand state common law").

the Court should decline to undertake such determination in advance of necessity, and deny

GNC's Motion to Dismiss this Count without prejudice.

As also noted, *supra* at 3, the interests of judicial economy particularly counsel deferral

on this matter because the record of a recent decision of this Court involving the same Plaintiff

and similar facts suggests that this precise question may be addressed by the Third Circuit in a

pending appeal.  See Bishop, Civ. Action No. 05-0827, W.D. Pa., Docket Nos. 126-128, Notice

of Appeal (USCA Case No. 06-2302).  See also id., Docket Nos. 38, 52, 53 ( First and Second

Motions for Reconsideration on this issue; Motion for Interlocutory Appeal as to Dismissal of

Plaintiffs' Claim for Breach of Implied Covenant of Good Faith and Fair Dealing).[28]

### D.  Breach of Fiduciary Duty

While the allegations raised by Defendants in this Count may support a counter-claim for

breach of good faith and fair dealing, they do not support a claim that GNC owed a higher,

fiduciary duty to its franchisee.  As Plaintiff observes, the established case law simply does not

support the existence of any fiduciary duty between a franchisor and its franchisees.  See

AAMCO Transmissions, Inc. v. Harris, 759 F.Supp. 1141, 1147 (E.D. Pa. 1991) (dismissing

---

[28]  Plaintiff errs in suggesting that an alternatively appropriate course of action is for this
Court to conclude that the Pennsylvania Supreme Court would not find a duty of good faith and
fair dealing in this context simply because it has not yet done so.  See Plaintiff's Reply Brief at
3-4 ("In light of the absence of Pennsylvania authority extending the implied duty of good faith
beyond the context of franchise terminations, this Court should *likewise conclude* that no such
duty exists in this case and dismiss Defendants claim . . . .") (emphasis added).  Cf. Harris, 759
F. Supp. at 1148 (noting that while Pennsylvania courts have to date identified the franchisor's
duty of good faith and fair dealing only in a termination context, "those discussions have not in
terms limited the duty to that context").

counterclaim as "a franchise relationship is not fiduciary in nature"); <u>Bishop</u>, 2004 WL 3263890 (observing that the "significant weight of authority holds that franchise agreements do not give rise to fiduciary . . . relationships between the parties") (citations omitted).[29]

A party bound by a *fiduciary* duty must advance the interests of the *cestui que trust* above its own and act scrupulously in the other's interests.  Imposition of this degree of duty - *i.e.*, selfless service as opposed to merely good faith and fair dealing - would generally be inapplicable as between parties to a commercial relationship knowingly entered into for each party's own profit, and Defendants present no Pennsylvania authority suggesting that it has been held applicable to a franchise relationship.[30]

In addition, Defendants' assertions to the contrary notwithstanding, the relationship between these parties is not analogous to that between majority and minority shareholders or a joint venture.[31]  Rather, in each of those contexts, the fiduciary exercises authority over the entirety of the business venture; that is, it is in a position to control the parties' joint power and

---

[29]   <u>See</u> <u>also</u> William L. Killion, <u>Existence of Fiduciary Duty Between Franchisor and Franchisee</u>, 52 A.L.R.5th 613 (noting that the majority of courts decline to recognize fiduciary obligations between a franchisor and franchisee).

[30]   <u>Cf.</u> <u>eToll</u>, 810 A.2d at 23 (noting, in affirming summary judgment on breach of fiduciary claim, that "[i]f parties to routine arms length commercial contracts . . . were held to have a "special relationship", virtually every breach of such contract would support a tort claim") (citing <u>Elliott v. Clawson</u>, 204 A.2d 272, 273 (Pa. 1986) (no special relationship between parties to arms-length business contract)).

[31]   <u>Compare</u> Defendants' Brief in Opposition at 8-9.

property.[32]  The instant action contains no allegation that GNC exercised any such power or was exercising authority on Defendants' behalf.

Finally, a franchise agreement is nominally an arrangement between arms-length bargaining entities.  And  Defendants' request that this Court recognize an action for breach of fiduciary duty is in essence a request that it pierce the veil of the contractual relationship and find a *de facto* joint venture.  This the Court should not do.  The mere presence of unequal bargaining power and one-sided contract terms is insufficient grounds to alter the business form in such a fundamental way.  Accordingly, GNC's Motion to Dismiss this Count should be granted.

### E.  Common Law Fraud

Defendants have alleged common law fraud in connection with GNC's mischaracterization of contractually-impermissible "remodeling" fees as "reset" fees properly chargeable under the franchise agreement.  See Counterclaim at ¶ 141 (asserting that GNC was "improperly extracting, misappropriating and converting fees from Defendants and other[s] . . . in violation of the remodeling terms and provisions of the franchise agreement").

But Defendants have failed to allege reliance thereon.  Moreover, given the state of the law as to Pennsylvania's interpretation of the gist of the action doctrine - as extensively reviewed in Section V(B), *supra* - this Court should conclude that Defendants' counter-claim is barred by said doctrine.  For claims resting on fees governed by the parties' written agreements are

---

[32] As Plaintiff rightly observes, a joint venture requires a "joint proprietary interest and right of mutual control" over the subject of the venture.  See Plaintiff's Reply Brief at 4-5 (citing Snellbaker v. Herrmann, 462 A.2d 713, 717 (Pa. Super. 1983)).  And shareholders are, similarly, "co-owners of [a] specific entity or business."  Id. at 5.

singularly breach of contract claims in a way that claims of, *e.g.*, fraudulent inducement to amend/extend such contracts are not.  See Sunquest Info. Systems, Inc. V. Dean Witter Reynolds, Inc., 40 F.Supp.2d 644, 651 (W.D. Pa. 1999) (noting that under the doctrine a party "cannot assert a fraud . . . claim when that theory is merely another way of stating its breach of contract claim, or when its success would be wholly dependent upon the terms of the contracts"); Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001) (stating that "a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contract, and not by the larger social policies embodied by the law of torts"). See also eToll, Inc., 811 A.2d at 20 (concluding that fraud claim based on, *e.g.*, contract performance practices of unauthorized, unnecessary, excessive or fictitious goods/services/charges, and allegations that party in essence stole money under the guise of contract performance, were barred under gist of the action doctrine); id. (describing barred fraud claims as contentions that party "perpetuated a number of fraudulent schemes in the course of the parties' contractual relationship"); Air Products, 256 F.Supp.2d at 341 (noting that "distinction between fraud in the inducement and fraud in the performance claims with regard to the gist of the action doctrine is crucial").  Compare discussion, *supra*, Section V(B).

## VI.  CONCLUSION

It is recommended that the Motion to Dismiss filed by GNC be granted in part and denied in part, as summarized in Section II, *supra*, and that absent amendment to allege standing within twenty (20) days from the date of this Report and Recommendation, the Court also *sua sponte*

dismiss Defendants' counter-claim for violation of the class settlement to which they were not party.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.



         /s/Lisa Pupo Lenihan        
LISA PUPO LENIHAN
United States Magistrate Judge


Dated: June 1, 2006


cc:       The Honorable Gary L. Lancaster
           United States District Judge

           All Counsel of Record